[Cite as *In re R.C.*, 2025-Ohio-5150.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| | | CASE NOS. CA2025-06-028 |
| R.C., et al. | : | CA2025-06-030 |
| | : | OPINION AND |
| | | JUDGMENT ENTRY |
| | : | 11/13/2025 |
| | : | |
| | : | |

APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 20233055; 20233056; 20233057; 20233058; 2023359; 20233060; 20233061

Brian A. Shidaker, Clinton County Prosecuting Attorney, and Danielle E. Sollars, Assistant Prosecuting Attorney, for appellee.

Susannah M. Meyer, for appellant, Mother.

The CMW Law Firm, and Anthony D. Maiorano, for appellant, Father.

Margie Eads, guardian ad litem.

## **O P I N I O N**

**BYRNE, J.**

{¶ 1} Appellants, the biological mother ("Mother") and father ("Father") of seven

minor children—Theo, Joseph, Francis, George, Stephen, Charles, and Ralph—separately appeal the decision of the Clinton County Court of Common Pleas, Juvenile Division, granting permanent custody of the children to Clinton County Children Services (the "Agency").[1] For reasons outlined below, we affirm the juvenile court's decision.

## I. Overview

{¶ 2} Mother and Father are married and are the biological parents to seven minor children – all of whom are boys. At the time of the permanent custody hearing, the children ranged from four years old to 13 years old.[2]

{¶ 3} On September 29, 2022, the Agency received a report alleging that two of the children—then one year old and four years old, respectively—were left unattended in their car seats in the family's driveway on a daily basis. The four-year-old was observed tipped over in the car seat, on his face, and trying to walk around with the car seat on his back. The report also alleged that Father would "scream and cuss" at the children and smack their heads when they were getting onto the school bus in the morning. The report further noted that the children did not bathe or change their clothes for days, and that one or more passengers on the bus gagged because of the children's foul smell. Furthermore, the report alleged that the children had dirt caked onto their skin. On this basis, the Agency opened an investigation and began working a voluntary case with Mother and Father.

### A. Agency's Voluntary Case with Mother and Father

{¶ 4} In 2022, during the voluntary period, the Agency was concerned about the

---

1. The children's names used in this opinion are pseudonyms adopted for the purposes of privacy and readability. *In re D.P.*, 2022-Ohio-4553, ¶ 1, fn. 1 (12th Dist.); *The Supreme Court of Ohio Writing Manual*, § 16, at 115 (3d Ed. 2024).

2. Theo was 13 years old; Joesph was 12 years old; Francis was 11 years old; George was 9 years old; Stephen was 8 years old; Charles was 6 years old; and Ralph was 4 years old.

children's hygiene and the cleanliness of the family's home. Because of these concerns, the Agency developed an initial case plan for Mother and Father.[3] According to Nathaniel Hawkins, an Agency caseworker, the initial case plan required Mother and Father to clean and remove trash from the house, to adhere to Stephen's prescribed treatment regimen for severe eczema, to help Theo address his inappropriately aggressive behavior at school, and to attend doctor's appointments for Charles, who had leukemia.[4]

{¶ 5} To assist Mother and Father in meeting their initial case plan goals, the Agency provided dumpsters for trash removal, set up a trash removal system, connected the family with a local school district that gifted them a new washer and dryer, secured clothing donations, obtained a referral to Ohio Rise to address Theo's behaviors, and instructed the parents on how to properly bathe and dry Stephen to address his eczema.

{¶ 6} Hawkins testified that shortly after getting involved, the Agency noted some improvements from Mother and Father, but they were unable to maintain their progress, and the Agency continued to receive reports about the family. Agency records indicate, and Hawkins further testified, that on October 13, 2022, the Agency received a report that the children's hygiene had worsened, that the children had scratches on their skin from a cat or their siblings, and that Stephen exhibited aggressive behavior at school. Then, on October 21, 2022, the Agency received a report that the family did not have food in their home on the weekends. On May 10, 2023, the Agency received a report that Father struck Joseph on the face, which left a mark. Subsequently, the Agency implemented a safety plan which required Mother to supervise Father when he was with the children.

---

3. The record is unclear on the precise date the initial case plan was adopted.

4. Much of Hawkins' testimony regarding events that occurred before he was assigned to the children's case was based on his review of Agency business records. Except where noted, Mother and Father did not object to this testimony.

{¶ 7}   Notably, Mother eventually testified that there was never a food insecurity issue in the home, and that the children always had food. The record reflects that Father and Joseph both denied that Father smacked Joseph. We need not decide these factual questions because the juvenile court allowed Hawkins' testimony on these three reports only to establish why he took his next steps in the investigation, not for the truth of the matter asserted.

### B. Temporary Custody and Updated Case Plan

{¶ 8}   In June 2023, one of the Agency's case workers, Sarah Smallwood, made an unannounced visit to the family home. Smallwood found spoiled food and trash piled in the home and an "unbearable" smell. The old washer and dryer that the school district replaced were in the kitchen with trash piled up around them to half their height. Spoiled food, used diapers, and chip bags were spread throughout the house. An Agency worker reported hearing rats or mice in the mounds of trash in the kitchen. All of this was the case despite the Agency's previous help in cleaning up the home. In other words, Mother and Father allowed the home to return to unsafe and unsanitary conditions after it was cleaned up with significant effort.

{¶ 9}   In response to these conditions, the Agency tried to implement an out-of-home safety plan, but the Agency could not locate friends or relatives with whom the children could stay. As a result, the same day, the Agency moved for and received temporary custody of the children, while also filing a complaint that alleged that the children were dependent and neglected. The children were then placed with separate foster care families. The children remained in the care of foster families through the remainder of this matter.

{¶ 10}  The Agency assigned Hawkins to the family's case after it took temporary

custody of the children. Hawkins visited the family home a few weeks after Smallwood's unannounced visit. Hawkins observed significantly less trash compared to Smallwood's previous findings, but he still saw a rat on the kitchen counter. Mother and Father conveyed to him that they were working on repairing holes in the walls and cleaning up trash, and Hawkins encouraged them to continue those and related cleanup efforts.

{¶ 11} The Agency developed an updated case plan with the goal of reunifying Mother and Father with the children. The updated case plan required Mother and Father to:

- continue to clean up trash and maintain a cleaner home to ensure safety and health;

- complete mental health assessments and follow all mental health recommendations;

- ensure Theo's participation in a program to address his aggressive acting-out behaviors, and follow the program provider's recommendations;

- create and follow a budget to prevent situations in which the family runs out of food before new food stamps are available, and use the community food bank to supplement their food if necessary;

- secure and maintain employment;[5]

- establish a schedule for the children to each bathe at least three times a week, and teach the boys how to properly wash, to prevent the children from appearing dirty in public; and

- ensure that Charles received appropriate treatment for his leukemia.

---

5. This requirement was to be satisfied if only one parent became employed, and the other served as caregiver to the children.

{¶ 12} Hawkins explained to Mother and Father that they needed to work on their case plan objectives to potentially be reunited with their children. As the case progressed, Hawkins eventually added two additional elements:

- address the agency's concerns about Mother and Father's parenting skills by taking a parenting class and demonstrating what they learned; and

- ensure the children received mental health assessments, and follow all of the resulting mental health recommendations.

## C. Dependency Adjudication and Permanent Custody Motion

{¶ 13} On August 24, 2023, with Mother's and Father's agreement, the juvenile court adjudicated the children dependent. The allegations of neglect were dismissed on the state's motion. With the agreement of Mother and Father, the court issued a disposition order in which it adopted the updated case plan and ordered that the children remain in the temporary custody of the Agency.

{¶ 14} Over a year later, on October 18, 2024, the Agency moved for permanent custody. Prior to the permanent custody hearing, the Guardian ad Litem ("GAL") who had been appointed for the children filed a report in which she recommended that the court grant permanent custody of the children to the Agency.

## D. Permanent Custody Hearing – February 12, 2025

{¶ 15} On February 12, 2025, the juvenile court conducted a permanent custody hearing. At the beginning of the hearing, the court took judicial notice of (1) the filed GAL report; (2) the fact that the children entered the temporary custody of the Agency on June 7, 2023; (3) the fact that the children remained in the Agency's temporary custody continuously through the date of the permanent custody hearing; and (4) the fact that the children were adjudicated dependent on August 24, 2023.

{¶ 16} The court then heard testimony. The state only presented two witnesses: Sherry Peterson (a therapist) and Nathaniel Hawkins (the Agency caseworker). Mother testified on her own behalf, and Father did not testify. We have summarized the witnesses' key testimony below, organized by topic.

### 1. Housing

{¶ 17} Hawkins testified that Mother and Father initially made efforts to fix holes in the walls of their home. However, in November of 2023, after the children were removed and placed in the Agency's temporary custody, Mother and Father were evicted from their home. Since then, Mother and Father have been homeless, paying on a day-to-day basis to live in a hotel room at the Wilmington Inn Hotel. Notably, this was not a first occurrence; the family previously lived in a hotel room for nearly two years from September 2016 to August 2018.

{¶ 18} In addition to keeping a clean and sanitary home, the Agency added the new element of securing a stable home to the updated case plan, because Mother and Father were living in a hotel. Hawkins visited Mother and Father's hotel room more than once. He described the hotel room as generally "cleaned and maintained." He observed some pizza boxes and food, but the room was "not trashed."

{¶ 19} Mother and Father attempted to find a home through the United States Department of Housing and Urban Development ("HUD") and various realty websites, but they were unsuccessful. The Agency attempted to help Mother and Father by referring them to the Community Health Alliance's PATH program in September 2023 and again in January 2025.

{¶ 20} Mother testified at the permanent custody hearing that she and Father would be viewing a potential home the following Monday. Mother and Father represented

to Hawkins that they were near the top of HUD's waitlist for a home. Hawkins testified that even if the couple were to immediately secure a home, the Agency would still not consider reunification with the children an option because "[t]here [were] other elements of the case plan that [were] not complete at [that] time."

{¶ 21} Hawkins testified that he spoke to Mother and Father about budgeting for a home, and they were uncertain what they could afford. He pointed out that they were paying $90 a night for their hotel room and did not have any money saved. The conversation went no further.

### 2. Employment and Finances

{¶ 22} Father and Mother obtained employment from Amazon about a year before the permanent custody hearing. They both made a little more than $21 per hour as of the hearing date and both of them worked the 4:00 p.m. to 12:30 a.m. shift.

{¶ 23} Given they worked the same shift, Mother testified that if the children were returned to her and Father's custody, she may have to find a new shift so she could watch the children while Father was at work. Mother also acknowledged that if the children were returned to her and Father's custody and she kept her job and continued to work the same shift as Father, then most of her income would go straight to childcare, which she estimated to cost $200 to $300 per night. She also indicated that she would be open to quitting and staying home with the children.

### 3. Mental Health and Medical Diagnoses

{¶ 24} As part of the initial case plan, Mother and Father were required to receive mental health assessments and comply with any resulting mental health recommendations. However, Mother and Father did not complete their mental health assessments, at ANEW Behavioral Health, until November 1, 2023, after the children

were taken into temporary custody.

{¶ 25} Sherry Peterson, an ANEW therapist, testified at the permanent custody hearing that Mother was diagnosed with severe Major Depressive Disorder and needed to attend mental health therapy weekly.[6] Peterson testified that Mother's depression was "so significant" it would "take some time" for Mother to be able to work through her mental health issues.[7]

{¶ 26} Mother attended nine out of the 12 sessions and only missed a few sessions due to her loss of insurance in August 2024. Mother even showed up for informal counseling meetings with Peterson when she lost her insurance. She attempted to reengage with ANEW in January 2025, and received therapy sessions with some regularity until the permanent custody hearing.

{¶ 27} Peterson reported that while receiving treatment from ANEW, Mother was "very committed" to her therapy, despite having three different counselors within a short amount of time. However, her commitment was only present "in the office," and Mother "went right back to whatever her husband wanted" when she left therapy sessions. This created a "two steps forward, three steps back" dynamic in her mental health treatment. However, Peterson testified that Mother loved her children deeply, and that she was trying to address other issues like housing and finances. But Peterson also noted that while Mother made some progress in her counseling sessions, she did not make the "deep [internal] changes she needed to make to get her kids back." When asked why she

---

6. Some of Peterson's testimony regarding the events that occurred before she was assigned to the Mother's case was based on her review of ANEW Behavioral Health's business records. Except where noted, Mother did not object to this testimony.

7. Peterson also testified that she would have amended the diagnosis to also include "posttraumatic stress disorder with significant depression and anxiety." She also expressed her belief that Mother had "some type of a trauma bond" with Father, but she could not identify this specifically.

believed Mother failed to implement necessary changes, Peterson answered, "I think she's afraid of her husband. I think she's afraid of not having her husband. I think she's afraid to not be able to stand on her own two feet." She clarified that Mother and Father had an unhealthy relationship. At the permanent custody hearing, Mother disputed that she was afraid of Father and testified that he was trying his best to be a hardworking, stable father figure.

{¶ 28} At one point, Mother showed up at ANEW with Father. Peterson explained that Mother seemed "very distraught and upset" because the Agency had told them that it was going to file for permanent custody of the children. Father stated that "maybe they should just wash their hands of it, sign off the kids, and they can just start over." Peterson acknowledged that Mother was "distraught" by Father's statement and opined that Mother felt that she was caught in the middle between Father and her children.

{¶ 29} Father's story was different. Hawkins understood, based on his communications with ANEW, that Father completed an initial mental health assessment and received recommendations for continued mental health treatment. Indeed, the record reveals that Father was diagnosed with unspecified anxiety disorder and was recommended to go to weekly psychotherapy sessions. But, Hawkins further explained that Father continuously denied that he had any mental health recommendations to complete, stating that his past counselor had mixed up his recommendations with Mother's. Father never pursued any mental health treatment, despite Hawkins' repeated urging.

{¶ 30} The Agency added the requirement that the children undergo mental health assessments to the updated case plan because they were having difficulty listening at school and in their foster homes, and were "showing behaviors" that were inappropriate

at school. The Agency hoped the assessments would determine whether the children's difficulties were merely behavioral or instead related to mental health. The assessments determined that all of the children, except for Ralph, had some type of mental health condition and required one or multiple prescriptions.[8] Mother testified she did not notice that the children had any mental health issues before their assessments, but she stated that after receiving the children's mental health assessments, she did not object and she wanted to make sure they were healthy and mentally stable.

### 4. Visitation and Parenting Classes

{¶ 31} While the Agency had temporary custody, Mother and Father were allowed visitation with the children at the Agency for an hour and a half each week. Hawkins testified that the visits tended to be chaotic because the children ran around, often exiting the room and even going so far as going out the Agency's back door. The parents were not in control of the children, and they regularly were frustrated with the children. When frustrated, Father yelled and screamed and stated things like, "I don't have to do this, I'm not going to do this, I'm going home, I'm going to the car." Hawkins was concerned that Father seemed to only pay attention to the youngest boy, Ralph, and would demand that Mother get the other children under control without Father's help.

{¶ 32} Mother and Father did not request any out-of-agency visits or community visits with the children. Even if Mother and Father had requested such visits, Hawkins testified that the Agency would not have allowed it since Mother and Father lived in a hotel, and the Agency wanted to see more controlled visits with the children. Additionally,

---

8. Theo was diagnosed with "other reactions to severe stress;" Francis was diagnosed with "other reactions to severe stress, sleep disorder, and ADHD"; Stephen was diagnosed with "other reactions to severe stress, sleep disorder, and ODD"; George was diagnosed with ADHD and insomnia; Joseph was diagnosed with "other reactions to severe stress, ADHD, sleep disorder, and ODD"; Charles was diagnosed with hyperkinesis, global development delays, ADHD, PTSD, episodic mood disorder, leukemia, and febrile seizures. Charles is now in remission from leukemia.

Mother and Father did not have relatives who could supervise the visits.

{¶ 33} According to the GAL report, the children grew excited and anxious in anticipation of seeing their family at visitations. However, the GAL noted that when Mother and Father called the children on the phone, the children did not want to talk long. The GAL also reported that Father "mostly sat on the couch and looked at his phone" during visits. On another occasion, the GAL report stated that Mother and Father had brought gifts and food to the visitation, and that "they were all doing well."

{¶ 34} Pursuant to the case plan, Mother and Father completed a parenting class at New Life Clinic in December of 2024. Hawkins testified that after Mother and Father completed the parenting class their visitations with the children became more organized and Father yelled less. Mother testified that the parenting class taught her to not "shame the [children]," to pay more attention to them, and to spend more time with them. Hawkins admitted that even though the children were still disobedient with their parents in visitations, these behaviors were occurring in the foster homes as well.

{¶ 35} During visitations, Hawkins observed that Mother was very attentive to her children and he described her as a "loving mother." The Agency also noted that Mother and Father expressed concern for the children and their various needs. Specifically, Mother would express interest in Charles and his illnesses, showed concern for Francis's "sexualized behavior," and even agreed to cut short visits with Charles to prevent his febrile seizures.

### 5. Cleanliness of Home

{¶ 36} The Agency took pictures of the kitchen when the Agency visited the family's home in June of 2023. Those pictures were introduced as evidence at the permanent custody hearing. The pictures depict broken bins, trash cans, bottles, and dishes on the

kitchen counter, and trash nearly halfway as tall as the family's new washer and dryer. They also depict clothes and trash piled up in front of the door and fireplace, and in the living room. As previously mentioned, Hawkins visited the home shortly after the June 2023 visit from the Agency. Upon his visit, Hawkins reported some improvement in the house, but he still saw a rat on the kitchen counter. And after the children were removed and Mother and Father moved into a hotel, Hawkins reported that their hotel room was fairly clean. The record is silent on whether this was because the hotel provided daily maid service, as most hotels do.

{¶ 37} Mother disputed the representativeness of the pictures, testifying they mostly depicted clothes that were piled up because the washer and dryer were broken. She also claimed trash was only on the floor because the children stepped on a bag of trash, ripping it open, despite her telling them not to do so. Yet Mother also effectively conceded that the home was consistently dirty when she claimed she was unable to keep a clean home because she had a hernia that prevented her from lifting more than five pounds. She said she had this hernia continuously from the time Ralph was born in February 2021 until she had surgery for her hernia in May of 2023, which caused her to be out of the house for six weeks.

### 6. Children's Relationships

{¶ 38} After the Agency took temporary custody of the children, and after some adjustments in the children's placements, the children were ultimately split up into three separate foster families. The five oldest children (Theo, Joseph, Stephen, Francis, and George) were placed with the same foster family in Brookville, Ohio, while the youngest two (Charles and Ralph) were placed in separate foster homes, in Washington Court House, Ohio and Wilmington, Ohio, respectively.

{¶ 39} According to Hawkins, Charles continued to struggle with behavioral issues in his new foster home, but he bonded well with his foster mother. Ralph had "done well" and "bonded well" with his foster family. He had good relationships with the other children in the home and played well with them. He was learning colors and shapes. The oldest five children, in the Brookville foster home, continued to struggle with listening and following rules "at times," but "overall" were "doing well in school" and were "doing well in the home." However, the record is silent on what kind of relationship, if any, the older five children had with their foster family. The GAL noted in her report that the children are "thriving" in clean environments with their foster families.

{¶ 40} Hawkins received updates from the foster families when there were problems with the children. However, these updates generally involved "normal kid behaviors" and there were "no major concerns."

{¶ 41} Hawkins testified that the Agency tried to place the seven children together but failed because the total number of children was too much for one foster family to handle. Among all the foster families, only Charles' foster family expressed their desire to adopt him. But the Agency still intended to seek adoption for all of the children if granted permanent custody.

{¶ 42} The record indicates that the children have a tight-knit relationship with each other. Hawkins testified that all the children are particularly attached to the youngest brother, Ralph, who was placed separately from the other children, and stated that it would not be in the best interest of the children to be split up. Hawkins also testified that the children would likely be split up if the Agency gained permanent custody of the children. Mother agreed with Hawkins that it would be detrimental for the children to be separated from each other. She stated that the children would "react against each other" if they were

separated and that it would be in their best interest to stay together.

**E. Continued Permanent Custody Hearings**

{¶ 43} At the conclusion of the February 12, 2025 permanent custody hearing, the juvenile court continued the hearing to March 10, 2025 so that Mother and Father could see the potential home they were scheduled to see on the following Monday and then report on their housing status.

{¶ 44} At the March 10 hearing, Mother and Father provided a letter from the Clinton Metropolitan Housing organization that they were on the "top of the wait list" for housing. Mother and Father also stated that they paid a $100 deposit for a house in Xenia. The juvenile court granted another continuance for Mother and Father since the court recognized that there was a "housing shortage" in the area and that Mother and Father had an "extra big challenge" in finding a house for seven children.

{¶ 45} At the last permanent custody hearing date, March 27, 2025, Mother and Father stated that their housing option in Xenia fell through but that they were confident that they would find another house soon. Consequently, the juvenile court gave Mother and Father an 11-day deadline, until April 7, 2025, to update the court over their housing situation.

{¶ 46} Mother and Father failed to provide an update on their housing situation in the final 11-day period. The juvenile court then granted the Agency's motion for permanent custody. The juvenile court found that granting permanent custody to the Agency was in the children's best interest. In so holding, the court noted, among other things, that there was "limited progress on the case plan," that Mother participated in mental health counseling but "did not appear to make progress outside of the counseling setting," that Father did not participate in mental health counseling, and that "even if the parents were

to obtain housing, the Court has doubts as to whether the parents could maintain the cleanliness of the home since they were not able to do so previously with support from the Agency." The court also explained that the mental health of the parents is a critical issue that must be fully addressed before reunification can be considered. Likewise, the court further noted that if the children were returned, Mother would likely have to quit her job, and Mother "being placed in the role of stay-at-home parent again would result in the same living situation that brought the family before the Court." Additionally, the juvenile court recognized that the children had been in the Agency's custody for 12 out of the last 22 months and that the children could not and should not be placed with either Mother or Father in a reasonable time.

{¶ 47} Mother and Father both appealed.

## II. Legal Analysis

{¶ 48} Mother raised one assignment of error and Father raised two. We will address Mother's assignment of error and Father's first assignment of error together as they raise similar arguments.

### A. Weight and Sufficiency of the Evidence

{¶ 49} Mother's assignment of error states:

> THE JUVENILE COURT ERRED BY GRANTING PERMANENT CUSTODY TO THE AGENCY CONTRARY TO LAW AND THE CHILDREN'S BEST INTEREST.

{¶ 50} Father's first assignment of error states:

> THE TRIAL COURT ERRED WHEN GRANTING PERMANENT CUSTODY OF THE CHILDREN TO THE AGENCY.

{¶ 51} Both Mother and Father make various arguments on appeal as to why the juvenile court's permanent custody findings are not supported by sufficient evidence or

are otherwise against the manifest weight of the evidence. Some of these arguments touch upon concepts relevant to the two prongs of R.C. 2151.414(B)(1)'s permanent custody test, and we will address their arguments within that framework where relevant below.

**1. Applicable Law and Standards of Review**

{¶ 52} "Before a natural parent's constitutionally protected liberty interest in the care and custody of [their] child[ren] may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met." *In re M.G.*, 2023-Ohio-1316, ¶ 44 (12th Dist.); R.C. 2151.414(E). Under R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re K.P.*, 2022-Ohio-1347, ¶ 17 (12th Dist.). First, R.C. 2151.414(B)(1) provides that the juvenile court must find that the grant of permanent custody to the agency is in the "best interest" of the child. *In re M.H.*, 2022-Ohio-48, ¶ 35 (12th Dist.). Second, the juvenile court must find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) apply. *In re R.B.*, 2022-Ohio-1705, ¶ 31 (12th Dist.). Those circumstances include, but are not limited to: (1) the child is abandoned, R.C. 2151.414(B)(1)(b); (2) the child is orphaned, R.C. 2151.414(B)(1)(c); (3) the child has been in temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period, R.C. 2151.414(B)(1)(d); (4) the child has been removed from the parents' custody or been adjudicated as abused, neglected, or dependent on three separate occasions, R.C. 2151.414(B)(1)(e); and (5) the circumstances described in R.C. 2151.414(B)(1)(b), (c), (d), and (e) do not apply and the child cannot be placed with either the child's parents within a reasonable time or should

not be placed with the parents, R.C. 2151.414(B)(1)(a). *In re J.B.*, 2023-Ohio-2454, ¶ 13, (12th Dist.). Only one of these circumstances need to apply to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 2020-Ohio-4414, ¶ 16 (12th Dist.).

{¶ 53} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re A.S.*, 2019-Ohio-4127, ¶ 19 (12th Dist.). However, "[e]ven if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence." *In re G.A.*, 2023-Ohio-643, ¶ 18 (12th Dist.), citing *In re F.S.*, 2021-Ohio-345, ¶ 61 (12th Dist.). In determining whether a juvenile court's judgment is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence favors the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 2021-Ohio-3074, ¶ 15 (12th Dist.). Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it the interpretation that is consistent with the verdict and judgment. *In re D.S.*, 2022-Ohio-998, ¶ 63 (12th Dist.).

### 2. First Part of Permanent Custody Test: Best Interest Analysis

{¶ 54} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, a juvenile court must consider all relevant factors,

including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . .;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in division (E)(7) to (11) of this section apply in relation to the parents and child.

A juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re A.J.*, 2019-Ohio-593, ¶ 24 (12th Dist.).

{¶ 55} In this case, the juvenile court evaluated each of the best interest factors and concluded that granting permanent custody of the children was in their best interest. Upon review, we agree.

{¶ 56} As to the first best-interest factor—that is, the interaction and interrelationship of the children with their parents, foster caregivers, and others, R.C. 2151.414(D)(1)(a)—the evidence is mixed.

{¶ 57} The evidence demonstrated that while Mother and Father regularly visited with the children when they were in the Agency's temporary custody, they seemed unable to control the children. This resulted in visits that were chaotic, with the children being "loud and obnoxious" and disobedient. Father would yell and scream out of frustration at

the children during supervised visits and would focus only on Ralph. However, this situation improved somewhat after Mother and Father participated in a required parenting skills class.

{¶ 58} Notably, Mother and Father did not even request out-of-agency or community visits. Even if they had made such a request, the Agency was concerned about what would occur outside of unsupervised visits. Regardless, the lack of information in the record about how Mother and Father would have dealt with the children outside of a supervised setting after completing parenting classes limits our ability to assess their current parenting skills. And we note it remains a concern that, prior to the children's removal from the home, Father's behavior suggesting physical abuse resulted in the Agency needing to require Mother to supervise Father when he was with the children.

{¶ 59} On the positive side, Mother was described as "loving" and attentive to the needs of the children during visits. Mother repeatedly asked questions about Charles' leukemia and febrile seizures, Stephen's eczema, and Francis's behavior. Mother even cut visits short to accommodate the children's needs. Mother worked on the case plan and showed progress during counseling sessions. But on the negative side, the record supports Hawkins' assessment that Mother felt caught in the middle between Father and the children and as a result she did not make the "deep changes" she needed to make to be reunified with her children, particularly with regard to her mental health.

{¶ 60} Conversely, Father minimally engaged in the case plan. On one occasion, Father told Mother that they should "just wash their hands of it and sign off the kids" so they could "start over." Another time, Father stated at visitation that he didn't "have to do this" and that he was "going to the car." There were also concerns that Father only paid attention to the youngest child, Ralph. Even then, the record demonstrates that Father

would repeatedly look at his phone during visits and would not engage with his children. Collectively, these comments and actions encapsulate Father's apparent indifference towards the children and to reunifying with them.

{¶ 61} Meanwhile, the children generally have good relationships with one another, which would likely be harmed if permanent custody were granted. The seven children are separated among three foster homes and likely will not be adopted together; even the five children who are currently placed in one foster home would likely be separated. The evidence demonstrates that Charles' foster family would likely adopt him, and that the other foster families have not expressed a desire to adopt the children. No other suitable or willing family options were identified as appropriate placements. In any event, the state failed to offer detailed testimony about the children's interactions with their current foster placements, leaving a gap in the evidence that undermines its own case.

{¶ 62} In summary, while Father tends to ignore his children, and engaged in behavior that rightly resulted in their removal from the home early in this matter, Father seems to have at least somewhat addressed these negative behaviors after participating in parenting classes. Even so, he continued to act in a manner that showed disinterest in the children. Meanwhile, Mother has shown that she is devoted to the children and has expressed willingness to make changes to provide a better environment for them. Also, the state's key witness admitted that separating the children would be detrimental to their well-being.

{¶ 63} Ultimately, this first best-interest factor, while presenting a close question, favors Mother and Father. They have at least made steps towards improving their parenting, while the state has offered little information about the children's foster families or potential for adoption, and that permanent custody would likely result in the children

being separated from one another.

{¶ 64} As to the second best-interest factor—the wishes of the children, R.C. 2151.414(D)(1)(b)—the GAL opined in her report that permanent custody of the children should be granted to the Agency. The record does not indicate whether the five oldest children expressed their wishes to the GAL and the two youngest children cannot articulate their wishes due to their young ages. However, the GAL did cancel the in-camera review to protect the children from getting their hopes up on returning to Mother and Father, which indicates that the GAL had some indications on how the children were feeling. The GAL observed several visitations with Mother and Father, and the foster families, and reported that the children were "thriving" in clean environments. She also stated that the two youngest children had bonded with their foster families and did not express any concerns about the five other children's foster family. The record does not reflect that the children had any behaviors or clear expressions that would indicate that they wanted to be back with Mother and Father.

{¶ 65} While this is a close call, and this court wishes that the GAL provided more detail in her report, we give deference to the GAL who observed the children for over a year in their respective foster families, and during visits with Mother and Father. The second factor favors an award of permanent custody to the Agency.

{¶ 66} As to the third best-interest factor—the custodial history of the children, R.C. 2151.414(D)(1)(c)—all of the children have been in the Agency's temporary custody since June of 2023. Therefore, this third best interest factor favors an award of permanent custody to the Agency.

{¶ 67} As to the fourth best-interest factor—the children's need for a legally secure permanent placement, R.C. 2151.414(D)(1)(d)—the record demonstrates that neither

Mother nor Father can provide the children with such a placement. While Mother engaged in her mental health treatment, she did not make the "deep changes" that were warranted. Likewise, Father minimally engaged in the case plan, leaving his mental health issues untreated.

**{¶ 68}** Most critically, at the time of the permanent custody hearing, Mother and Father did not have a stable home for their seven children. They were effectively homeless, living in a hotel room for over a year. And this was not the first such instance; they had previously lived in a hotel with their children for over two years. Despite recent efforts to secure a home, Mother and Father did not act soon enough and should have realized much sooner that living in a hotel room is not suitable for seven children. We recognize the difficulties in obtaining a home in this current market, but Mother and Father had more than a year to find a suitable home. Even if they had secured a small apartment for only themselves, this would have surely cost less money than paying for $90/day hotel room, and would have allowed them to save up money for a larger apartment or house that could accommodate the children.[9] But even if Mother and Father had secured another residence in time, we share the juvenile court's concerns that the family's home would return to deplorable conditions, just as it did after the Agency first provided assistance in cleaning up the home.

**{¶ 69}** This is not to say the state offered a significantly better alternative. The record demonstrates that only Charles' foster family indicated that they would adopt him, while the other children are likely to remain in foster care, which is not a permanent solution. However, the scant evidence offered by the state indicates that the children have

---

9. We note that Mother and Father's hourly wages at Amazon, assuming full-time work, result in a family income of more than $85,000 per year—certainly enough to not have to live in a hotel room.

been doing reasonably well in their foster placements.

{¶ 70} On balance, then, we find that the fourth best-interest factor favors the Agency receiving permanent custody. Mother and Father clearly have not taken the steps needed to provide a legally secure permanent placement.

{¶ 71} The trial court considered an additional best-interest factor found in R.C. 2151.414(E)(1)—that is, whether Mother and Father had "failed continuously and repeatedly to substantially remedy the conditions causing the child[ren] to be placed outside the child's home." The juvenile court found this to be the case, and for reasons already stated above, we agree.

{¶ 72} As a result of the foregoing, we conclude that the juvenile court did not err in finding the best interest factors weighed in favor of awarding permanent custody to the Agency. This is not to say that we are not concerned by the relatively small amount of evidence offered in this case (at least when compared to most permanent custody cases brought before this court on appeal) given the life-altering seriousness of permanent custody decisions applicable to seven children.[10] But as explained above, in reviewing a juvenile court's permanent custody decision in which the evidence is susceptible to more than one construction—as is certainly the case here—we are "bound to give [the evidence] that interpretation which is most favorable and consistent with the verdict and judgment." *In re D.S.*, 2022-Ohio-998, ¶ 63 (12th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 21. In doing so, we note there is evidence supporting the juvenile court's conclusion that despite Mother's (and to some extent Father's) efforts, the most serious

---

10. This case involves a mere 133 pages of testimony at the initial permanent custody, a mere 12 documentary exhibits, and only two witnesses offered by the state (offering little testimony about the children's foster placements or the children's present conditions and wellness). While we find there is minimal sufficient evidence to satisfy the applicable permanent custody standard, this case certainly could have been litigated in a more robust manner that would have given the juvenile court and this court more information on which to make decisions.

issues—housing and mental health—remain unaddressed or insufficiently addressed, such that the juvenile court's best interest finding is not legal error. There is sufficient credible evidence to support the juvenile court's determination that awarding permanent custody to the Agency was in the best interests of the children, and the juvenile court's determination is not against the manifest weight of the evidence.

### 3. The Second Part of the Permanent Custody Test

{¶ 73} As mentioned above, the juvenile court found that two of the circumstances under the second prong of the permanent custody test were met. Specifically, the court found that (1) the children had been in the Agency's custody for at least 12 of the last 22 months (referencing the "12 of 22" circumstance described in R.C. 2151.414[B][1][d]), and (2) the children could not or should not be placed with either the Mother or Father in a reasonable time (referencing the "reasonable time" circumstance described in R.C. 2151.414[B][1][a]).

{¶ 74} On appeal, Mother and Father do not challenge the juvenile court's "12 of 22" finding. Because they do no not challenge the "12 of 22" finding, we do not need to review that finding. *In re Z.B.*, 2024-Ohio-5387, ¶ 32 (12th Dist.). However, we note that the record unquestionably establishes that the "12 of 22" finding was met because the children were placed in temporary custody of the Agency in June of 2023, were adjudicated dependent in August of 2023, and remained in the Agency's custody through the date the Agency filed for permanent custody, in October of 2024. As such, the state satisfied the second prong of the permanent custody test.

### 4. Reasonable Efforts

{¶ 75} Mother also argues that the juvenile court failed to issue written findings of fact stating the reasons supporting its reasonable efforts determination under R.C.

2151.419. Mother states that the plain reading of R.C. 2151.419(B)(1) requires the juvenile court to state why the court found that the Agency made reasonable efforts for reunification.

{¶ 76} Mother's argument is misguided because R.C. 2151.419 is not relevant to our permanent custody analysis on appeal. "Generally, a juvenile court does not have to make a reasonable efforts determination pursuant to R.C. 2151.419(A)(1) in a permanent custody hearing. *In re K.K.*, 2017-Ohio-9098, ¶ 55 (12th Dist.), citing *In re C.F.*, 2007-Ohio-1104, ¶ 41. "By its terms, R.C. 2151.419 applies only at a hearing held pursuant to R.C. 2151.28, 2151.31(E), 2151.33 or 2151.251." *Id.* "These sections involve adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state" and are not at issue in this appeal. *Id.* Therefore, Mother's "reasonable effort" argument is not relevant to our permanent custody analysis on appeal.

{¶ 77} Considering the foregoing, we conclude that juvenile court's decision was supported by sufficient evidence and not against the manifest weight of the evidence, and we overrule Mother's assignment of error and Father's first assignment of error.

### B. Failure to Conduct In-Camera Interviews

{¶ 78} Father's second assignment of error states:

> THE TRIAL COURT ERRED WHEN IT FAILED TO CONDUCT *IN CAMERA* INTERVIEWS OF THE CHILDREN.

{¶ 79} Father argues on appeal that the juvenile court was required under R.C.2151.414(D)(1) to conduct in-camera interviews to determine the children's wishes.

### 1. Factual and Procedural Background

{¶ 80} The record reflects that the juvenile court scheduled an in-camera interview

with the five oldest children after the first permanent custody hearing date for the purpose of determining the children's wishes. But because Mother and Father did not secure housing, the GAL requested that the in-camera review be cancelled. On the second permanent custody hearing date, the juvenile court cancelled the in-camera interviews at the request of the GAL, who expressed that she did not want to get the children's hopes up. Mother and Father did not object, nor did they request another in-camera review. Accordingly, there was no in-camera review, and the court relied on the GAL report in determining the best wishes of the children.

### 2. Applicable Law and Standard of Review

{¶ 81} R.C. 2151.414(D)(1) states that, "[i]n determining the best interests of a child at a hearing . . . the court shall consider all relevant factors, including, but not limited to . . . (b) the wishes of the child, as expressed directly by the child, *or* through the child's guardian ad litem, with due regard for the maturity of the child . . ." (Emphasis added.) "The statute unambiguously gives the trial court the *choice* of considering the child's wishes directly from the child or through the guardian ad litem." (Emphasis added.) *In re C.F.*, 2007-Ohio-1104, ¶ 55. "The statute does not impose the additional requirement that the trial court also consider whether the children want to testify or whether testifying would be detrimental to them." *Id.* "The trial court has discretion to accept testimony of the guardian ad litem on the child's wishes rather than hearing a direct expression of those wishes made by the child." *Id.* at ¶ 56. "The trial court should not be overruled absent a showing that the court acted in an unreasonable, arbitrary, or unconscionable manner." *Id.*

### 3. Analysis

{¶ 82} In this case, the GAL filed a report which indicated that granting permanent

custody to the Agency is in the best interest of the children. Although the children did not directly express their wishes, the GAL believed that it was in the best interest of the children to grant permanent custody to the Agency, after observing and interacting with the children for over a year. Likewise, the GAL indicated that Mother and Father do not have secure housing for their children, and that the children are doing well in their foster families. Moreover, upon the cancellation of the in-camera review, Mother and Father did not object, nor did they request another one. Therefore, upon our review, the trial court did not abuse its discretion in relying on the GAL report in determining the children's wishes.

{¶ 83} We overrule Father's second assignment of error.

### III. Conclusion

{¶ 84} For these reasons, we conclude the juvenile court did not err by determining that it was in the children's best interest to grant permanent custody to the Agency. The juvenile court's decision to grant permanent custody of the children to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. We overrule Mother's assignment of error, and Father's two assignments of error.

{¶ 85} Judgment affirmed.

HENDRICKSON, P.J., and M. POWELL, J., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Clinton County Court of Common

Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.


/s/ Robert A. Hendrickson, Presiding Judge


/s/ Mike Powell, Judge


/s/ Matthew R. Byrne, Judge