[Cite as *In re S.B.*, 2026-Ohio-947.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| | | CASE NOS. CA2025-10-040 |
| S.B. | : | CA2025-10-041 |
| | : | |
| | : | <u>OPINION AND</u> <u>JUDGMENT ENTRY</u> 3/20/2026 |
| | : | |
| | : | |

APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20233033

Brian A. Shidaker, Clinton County Prosecuting Attorney, and Danielle E. Sollars, Assistant Prosecuting Attorney, for appellee.

Christopher Bazeley, Holly M. Simpson, for appellant.

## **O P I N I O N**

**BYRNE, P.J.**

{¶ 1} The biological mother ("Mother") and father ("Father") of "Sara," a minor child, separately appeal the decision of the Clinton County Court of Common Pleas, Juvenile Division, granting permanent custody of Sara to Clinton County Children

Services (the "Agency").[1] Mother and Father challenge the juvenile court's decision as not being supported by sufficient evidence or by the manifest weight of the evidence. For reasons outlined below, we affirm the juvenile court's decision.

## I. A Note on Hearsay in Permanent Custody Proceedings

{¶ 2} We begin this opinion by taking the unusual step of pausing to comment on the use of hearsay in permanent custody cases.

{¶ 3} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). The Rules of Evidence provide that "[h]earsay is not admissible except as otherwise provided" by various constitutional or statutory exceptions, or by exceptions set forth in the Rules of Evidence or other court rules. Evid.R. 802.

{¶ 4} Juv.R. 34(I) provides that "[t]he Rules of Evidence shall apply in hearings on motions for permanent custody." Thus, Evid.R. 802 applies in permanent custody hearings, and it is well established that "[h]earsay is *inadmissible* in hearings on motions for permanent custody." (Emphasis added.) *In re M.G.*, 2023-Ohio-1316, ¶ 35 (12th Dist.).

{¶ 5} Upon our review of the transcripts relevant to this appeal, we could not avoid noticing that surprising amounts of hearsay testimony were offered during the permanent custody hearing. Some factual issues were *only* addressed with hearsay testimony. There were a few objections on hearsay grounds; some of those objections were sustained, and others were overruled.[2] But there was much hearsay that was offered to which no

---

1. "Sara" and all other first names stated in this opinion are pseudonyms adopted for the purposes of privacy and readability. *In re R.C.*, 2025-Ohio-5150, ¶ 1, fn. 1 (12th Dist.); *The Supreme Court of Ohio Writing Manual*, § 16, at 115 (3d Ed. 2024).

2. We offer no opinion on the court's hearsay rulings as those have not been challenged on appeal.

objection was made.

{¶ 6} The failure to object to inadmissible hearsay at a permanent custody hearing results in waiver of all but plain error. *In re M.G.*, 2023-Ohio-1316, ¶ 34 (12th Dist.), citing *In re B.J. & L.J.*, 2016-Ohio-7440, ¶ 61 (12th Dist.). But this does not mean courts have complete freedom to consider inadmissible hearsay. Instead, "'it is well-established that as the fact-finder, a juvenile court is presumed to have considered only properly admissible evidence unless the record affirmatively demonstrates otherwise.'" *In re G.B.*, 2025-Ohio-5803, ¶ 28 (12th Dist.), quoting *In re H.D.*, 2017-Ohio-1333, ¶ 8 (12th Dist.). The admission of hearsay evidence is considered prejudicial—and thus supportive of plain error—if "it is shown that the judge relied on improper evidence in making his decision." *In re K.B.*, 2014-Ohio-3654, ¶ 83 (12th Dist.), citing *In re C.J.*, 2014-Ohio-2403 (8th Dist.). "That is to say, the juvenile court's admission of 'inadmissible hearsay [evidence] is grounds for reversal only if the juvenile court relied on the evidence to terminate parental rights.'" *In re G.B.* at ¶ 28, quoting *In re W.R.*, 2012-Ohio-382, ¶ 26 (12th Dist.).

{¶ 7} The juvenile court here mentioned hearsay evidence in its summary of the permanent custody hearing, but we find no indication that the court *relied* on inadmissible hearsay in reaching its permanent custody decision. On appeal, Mother and Father have not challenged the admission of hearsay at the permanent custody hearing, let alone argued plain error. While we do not today announce a rule preventing courts from *ever* considering hearsay to which no objection was made, we do find that the amount of plainly inadmissible hearsay testimony in this case was so significant that it would be prudent for us to avoid describing that testimony or relying on it in our analysis of the sufficiency-of-the-evidence and manifest-weight-of-the-evidence assignments of error.

{¶ 8}  As a result, in this opinion, we will not summarize or consider evidence that we determine, on its face, was inadmissible hearsay. This will result in a significant portion of the evidence introduced at the permanent custody hearing being excluded from our summary and analysis. The parties may find this troubling, as important topics (such as testimony about Mother either permitting, facilitating, or ignoring Sara's access to inappropriate sexual materials online, including the exchange of sexual pictures with adults) will not be discussed or considered in our opinion to the degree they were discussed during the hearing. In the future, if the parties wish for such important topics to be considered by this court, they should follow the Rules of Evidence and rely only on *admissible* evidence to establish key facts in the record, rather than relying on inadmissible hearsay.

{¶ 9}  For the reasons discussed below, we find there is sufficient admissible evidence in the record to affirm. Likewise, we find that the manifest weight of the admissible evidence supports the juvenile court's decision. Even if we considered the inadmissible hearsay in the record, we would reach the same conclusion.

## II. Factual and Procedural History

{¶ 10}  Sara, a biological female, was born in 2010, while Mother and Father were married.[3] Her parents divorced in 2015. Mother later married a man we will refer to as "Second Husband." Mother then became the primary caretaker of Sara and Second

---

3. The record indicates that, during the pendency of the children's services case, Sara repeatedly changed the pronouns that she prefers. We will refer to Sara accurately, as a female. *See In re J.K.*, 2025-Ohio-3190, ¶ 1, fn. 1 (12th Dist.); Ohio Code of Judicial Conduct Rule 1.2 ("A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary . . . "); *United States v. Varner*, 948 F.3d 250, 254-58 (5th Cir. 2020) (denying male litigant's motion asking the district court and government to refer to litigant with his preferred female pronouns, based on the lack of legal authority requiring such usage, the need to maintain judicial impartiality, and the complexities associated with shifting and newly-created pronouns).

Husband's two minor daughters, who we will refer to as Sara's "stepsisters."[4] At the time of the permanent custody hearing, Sara was 14 years old.

**A. Agency's Initial Involvement**

{¶ 11} In March 2023, Mother, Sara, and the stepsisters were temporarily staying with Mother's adult daughter, "Kim," in Wilmington, Clinton County, Ohio. Police arrested and charged Mother with domestic violence after she was alleged to have physically assaulted Kim during a domestic dispute. During the police investigation, Mother revealed that Sara and her stepsisters had been living in Clinton County in Mother's Jeep after Second Husband lost his job and abandoned them. This led to a March 14, 2023 report to the Agency that Sara and the stepsisters were homeless and exposed to domestic violence.

{¶ 12} While Mother was in jail, Sara and the stepsisters initially stayed with Kim, but they were soon placed with a foster family. That placement ended after Sara struck one of the stepsisters. Sara was then placed at One Way Farm for a couple of weeks.

{¶ 13} Father picked up Mother when she was released from jail. After her release, Mother and Father took drug tests. Mother tested positive for methamphetamine and THC and Father tested positive for alcohol. As a result, the Agency asked Mother and Father for potential alternative placements for Sara, but they did not provide any names.

{¶ 14} On March 17, 2023, the Agency filed a motion for emergency custody of Sara in the Clinton County Court of Common Pleas, Juvenile Division. The juvenile court granted the Agency's request that same day. On March 20 and 21, 2023, the juvenile court conducted an emergency shelter care hearing. On March 21, 2023, the Agency filed

---

4. The stepsisters are not at issue in this appeal. However, the stepsisters have their own cases with the Agency.

a complaint with the juvenile court, alleging that Sara was neglected and dependent. On the same day, the Agency filed for temporary custody of Sara. The juvenile court granted the Agency's motion for temporary custody and placed Sara in a qualified residential treatment program.

{¶ 15} On April 9, 2023, the Agency placed Sara with her half sister, "Karen." Karen is Father's adult daughter from a previous relationship, and so is not related to Mother. Sara continued to reside with Karen through the date of the permanent custody hearing in this case.

{¶ 16} On May 17, 2023, the juvenile court dismissed the neglect allegation on the state's motion and adjudicated Sara dependent.

### B. Agency's Concerns and Initial Case Plan

{¶ 17} As stated above, the initial concerns that led to the Agency obtaining temporary custody of Sara were homelessness and exposure to domestic violence. But in working with Sara, Mother, and Father, the Agency developed additional concerns: Mother's drug use (she twice tested positive for methamphetamines); educational neglect of Sara; the mental health of Sara, Mother, and Father; and Sara's physical health. Regarding Sara's mental and physical health, the Agency was concerned because Sara flapped her hands continuously, would not make eye contact, had suicidal ideations, had a prominent lisp, and had not seen doctors regularly.

{¶ 18} On June 13, 2023, the juvenile court approved the Agency's initial case plan for Sara and Mother and Father. At the time, the case plan's goal was reunification.

{¶ 19} The initial case plan required Mother to secure and maintain stable housing, participate in an anger management course, complete drug and alcohol and mental health assessments, complete a parenting course, and follow through with all resulting

- 6 -

recommendations.[5] She was also directed to address domestic violence concerns and to address Sara's mental health issues.

{¶ 20} The case plan required Father to complete drug, alcohol, and mental health assessments, and to follow through with all resulting recommendations. The plan also required Father to participate in counseling, to submit to random drug tests, and to take a parenting course.

{¶ 21} The case plan required Sara to take a mental health assessment and to follow through with the resulting recommendations. The case plan also required her to see a medical doctor and to follow through with the doctor's recommendations.

## C. Father's Removal from the Case Plan

{¶ 22} On December 4, 2023, the Agency filed an updated case plan with the juvenile court. The Agency removed Father from the case plan because he had "not engaged in the case plan services" and refused to meet and communicate with Agency caseworkers. Father never subsequently requested to be added back onto the case plan and never requested to be Sara's primary caretaker.

## D. Termination of Visitation

{¶ 23} After Sara entered temporary custody, Mother and Father were initially permitted in-person visitation with Sara. But the Agency viewed the visits with Mother as difficult for Sara, who indicated that Mother would "chastise and make fun of her during visits." And after a visit during which Sara informed Father that she wished to use male pronouns, Father ceased attending visits with Sara. Due to the fact that Sara and Mother's visits had been going very poorly, the Agency suspended Mother's in-person visits with

---

5. On July 31, 2023, the court issued an order modifying Mother's case plan requirements, stating that Mother did not need to take a drug and alcohol assessment because she tested negative for all substances (excluding THC).

Sara.

{¶ 24} Neither Mother nor Father ever saw Sara in person again after December 2023. However, the Agency attempted to move towards resuming visits with Mother by engaging in a period in which Mother and Sara communicated by exchanging written letters.

### E. Emergency Motion to Cease All Contact

{¶ 25} At some point the Agency began discussing the possibility of resuming Father's in-person visits with Sara. On May 20, 2024, Sara's attorney, Lynn Turner, filed an emergency motion to cease all contact between Sara and Mother and Father. Turner, in the motion, stated that she filed the motion to cease contact because Sara "vehemently represented to the Agency that she [did] not wish to see her Father" and because Sara did not feel comfortable writing or receiving letters from Mother because it created anxiety for her. The next day, the juvenile court granted Turner's motion, and the cease-contact order went into effect.

### F. Permanent Custody Motion

{¶ 26} On September 4, 2024, the Agency filed a motion for permanent custody of Sara. The Agency recommended that Sara be adopted by Karen, who expressed willingness to adopt.

### G. Permanent Custody Hearing

{¶ 27} The juvenile court conducted the permanent custody hearing on two dates: February 3, 2025, and April 24, 2025. At the beginning of the permanent custody hearing, the juvenile court took judicial notice of (1) the filed GAL report, which recommended an award of permanent custody to the Agency; (2) the fact that Sara entered the temporary custody of the Agency on March 17, 2023; (3) the fact that Sara was adjudicated

dependent on May 17, 2023; and (4) the fact that Sara's visitations with Mother and Father were suspended on May 21, 2024.

{¶ 28} During the state's case-in-chief, the state presented four witnesses: Mother (as an adverse witness); Abigail Channell (Sara's therapist at Inclusive Counseling); Karen (Sara's half sister and current placement); and Amanda Quallen (an Agency caseworker assigned to Sara for two years). Mother testified again during her case-in-chief, and Father testified during his case-in-chief. We have summarized the witnesses' key permanent-custody hearing testimony below, organized by topic, and subject to the exclusion of plainly inadmissible hearsay testimony discussed above.

## 1. Eviction and Homelessness

*Mother's Perspective*

{¶ 29} Mother discussed the family's homelessness in 2023. She explained that her marriage to Second Husband had consistent issues and that Second Husband would occasionally abandon her. In 2023, Mother, Second Husband, Sara, and the stepsisters lived for a time in a rented historic home in Lebanon. However, Second Husband "lost a second job from a second boss getting COVID" and again abandoned the family. Mother, Sara, and the stepsisters were then evicted from the rented historic home.

{¶ 30} Mother testified that she tried to prevent being homeless by taking out a $3,400 loan to pay for rent, but she still failed to find a place to live after the eviction because "the housing market shot up dramatically and $3,400 wasn't even enough to get [the family] into even a not so good rental."

{¶ 31} Mother testified that she, Sara, and the stepsisters were homeless for three months. During this time, they stayed with Father for about a month, Father's mother for about a month, a client of Mother's for two weeks, and Kim "a couple of times." Mother

admitted that "there were time[s] that [they] did have to sleep in the Jeep" but denied that this was "a continuous situation." Mother characterized Father's mother's house as a "drug trailer" and stated that while living with her, Father's mother tainted Mother's toothpaste with drugs, causing Mother's positive-for-methamphetamine drug test result discussed above. Mother testified that homeless shelters turned them away because she did not have any legal custody rights to the stepsisters, and that she had to make a choice "between [her] and [Sara] being allowed to stay at a homeless shelter, or none of [them]."

{¶ 32} Multiple times during her testimony, Mother minimized the seriousness and impact of being homeless. She stated that Sara and the stepsisters were "the happiest homeless kids [Mother] had ever seen" and that Sara "still brushed [her] teeth everyday" and "wore clean outfits everyday." Mother denied allegations that Sara faced food scarcity while homeless and that the family sometimes had to resort to stealing food.

*State's Witnesses' Perspective*

{¶ 33} Karen testified to her understanding—based in large part on hearsay statements made to her by Sara—about the deplorable conditions Sara faced when living with Mother, whether in a home or while homeless. We note Karen's understanding here only because it provides background context for Karen's testimony about a conversation she had with Father. Specifically, Karen confronted Father about Sara's homelessness and asked him about the possibility of him allowing Sara to live with him. Karen testified that Father refused and stated that Sara "needed to be with her mother regardless of what that looked like."

**2. Domestic Violence**

*Mother's Perspective*

{¶ 34} Mother testified about the incident that led to police filing a domestic

violence charge against her. In Mother's version of events, she took Sara to Kim's house to shower while homeless, and Kim became upset with Mother because she did not have money or food to give to Kim. While Mother was in the bathroom, Kim busted down the door and "knocked [Mother] into the sink and drew her fist back as if she were going to hit [Mother]." Mother testified that she "put [her] hand up to stop her" and that she did not make any physical contact with Kim. Mother further testified that she told Kim that she was going to Walmart and left her house. The police arrested Mother at Walmart because Kim "had either a scratch or mark or something on her face when they interviewed her . . . [while Mother] didn't have any visible marks." The state offered no evidence regarding whether Mother was convicted.

{¶ 35} Mother also testified about the allegation that Sara's frequent flinching resulted from Mother punching Sara (as discussed below). Mother denied that she punched Sara and denied that her own domestic violence incidents or general behavior caused Sara's tendency to flinch when approached by another person. In fact, Mother claimed that Sara never flinched in that manner when she lived with Mother, and that Sara only started doing so when she lived in the group home, where Mother alleged physical abuse was taking place.

### State's Witnesses' Perspectives

{¶ 36} Quallen was concerned that Mother did not "take responsibility for the domestic violence, [and] physical incidents, that . . . occurred." She was also concerned that Mother took the view that because Second Husband had cheated on her, "anything that [Mother] did was justified." Quallen noted that Mother once stated that she slapped Second Husband while he was driving because he was driving erratically; Quallen was concerned that Mother did not view this behavior as inappropriate.

{¶ 37} Karen noticed behavior by Sara that she believed indicated past exposure to domestic violence. Specifically, Karen testified that Sara "would flinch when [Karen] got near her," and she believed that this was because Sara "was so used to being smacked in the head" by Mother. This flinching happened so often that Karen began asking Sara for permission before giving her a hug, so that Sara knew the hug was coming.

### 3. Educational Neglect

*Mother's Perspective*

{¶ 38} Mother testified that she homeschooled Sara her whole life, including during the family's period of homelessness. This homeschooling apparently involved Sara taking at least some courses online, though the extent and nature of these online courses was not explored at the hearing. Mother denied that Sara was academically behind when she entered temporary custody and claimed that Sara had made "straight-A's all of her life" until she entered temporary custody. But when asked about Sara failing all of her online courses at the time she was taken into temporary custody, Mother offered a different story, testifying that she "knew that [Sara] wasn't attending some of her classes, and that [she] did see that she had gotten a couple of bad grades on some tests." She also explained that Sara's grades slipped when they were homeless because they did not have Wi-Fi. Mother also admitted that she knew that Sara was playing games on her computer during school time.

*State's Witnesses' Perspectives*

{¶ 39} Quallen testified that the Agency was concerned that Sara experienced educational neglect while in Mother's care. However, since entering Karen's care, Sara was "doing great" and "excelling in school." She "put in a lot of work" and "caught up"

from where she was academically when she left Mother's custody.

{¶ 40} Karen testified that when Sara came to live with her, she was failing her classes, and she tested "at the very bottom" of sixth grade standardized testing in mathematics. She believed that Sara had previously spent much of her school time in online chat rooms. Karen took steps to help Sara improve academically. After some time, and after working with "two amazing teachers" and a tutor, Sara tested "above average" in the standardized mathematics test. Karen testified that since living with her, Sara has "done amazing academically," makes nearly straight-A's, and she has been accepted to three private high schools. Karen also made efforts to get Sara involved in outside activities. While in Karen's care, Sara has participated in choir, taekwondo, kickboxing, summer camps, art camps, and a writing camp.

### 4. Online Activity

*State's Witnesses' Perspectives*

{¶ 41} Karen testified that, based on her knowledge, while Sara was living with Mother, she had "unfettered access to the Internet." Sara participated in chat rooms when she should have been attending school, "exchanged nude pictures with a little boy," and had recently unlocked memories of "horrific experiences" with "multiple grown men" in chat rooms.[6] Karen believed that Sara's recollection of these and other disturbing events contributed to incidents of self-harm, panic attacks, crying, flashbacks, and inability to sleep.

{¶ 42} Karen took steps to protect Sara from inappropriate online activity by limiting her online access to that provided and monitored by Sara's new school. Karen initially

---

6. Karen did not explain the basis for her knowledge about these events. The basis may have been inadmissible hearsay. But in the absence of an objection or assignment of error, or any testimony one way or the other, we will not simply assume that Karen was basing her knowledge on inadmissible hearsay.

allowed Sara to use a cell phone, but Karen approved and monitored the apps on the phone. Through this monitoring, Karen discovered that Sara was using an app called "Character AI" to interact with an AI character in ways that Karen believed mimicked her dysfunctional relationship with Mother, and in which Sara talked about her past abuse and had sexual conversations with and "dated" a married man. Karen then removed the "Character AI" app from the phone. When Karen discovered that Sara exchanged "very sexually violent" texts with another child, which involved violent "S&M" or "bondage," she took the phone away and replaced it with one that had no online access and that would only allow Sara to call Karen or 911.

{¶ 43} Karen believed that Sara had found a supportive community in LGBT chatrooms while living with Mother. But Karen also believed that these chat rooms exposed Sara to sexual topics at too young of an age (around age 10).

*Mother's Perspective*

{¶ 44} Mother testified that she did not supervise Sara's computer use because Sara's online school issued her laptop and assured Mother that Sara could not get on adult websites. Mother also testified that she took away Sara's computer when she became aware of Sara's inappropriate online activity, which she admitted involved "the other two girls." However, Mother did not elaborate on who "the other two girls" were or what the inappropriate online activity specifically involved.

*Father's Perspective*

{¶ 45} When asked about Sara's inappropriate online activities, Father testified that the "only thing [he was] aware of [was] the fact that [Sara] had gotten online a couple of times with some inappropriate men." He claimed that he "shut that down as soon [he] found out," but he did not clarify the steps he took to do so or when this occurred.

### 5. Sara's Physical Health

*Mother's Perspective*

{¶ 46} Mother testified that she did not take Sara to the doctor for regular wellness checks, but only when she was sick. Sara was never vaccinated. Mother admitted that Sara did not receive medical care when Sara had COVID, but stated this was on the advice of medical providers. Mother testified that Sara did not regularly visit the dentist because "her teeth were great." Mother explained that she did not engage in preventive medicines with Sara.

*State's Witnesses' Perspectives*

{¶ 47} Quallen testified that the Agency was concerned about Sara's physical health. The Agency was also concerned about Sara's lack of eye contact and Sara's frequent flapping of her hands.

{¶ 48} Karen testified that Sara had no medical care for seven years. When Sara came to live with Karen, Karen was concerned because Sara weighed 300 pounds and had a black ring around her neck of unknown origin. Karen took Sara to the doctor to have a wellness check. The doctor indicated that Sara was relatively healthy, except for her weight. After a few weeks of bathing, the black ring around Sara's neck "just went away," which led Karen to believe it was embedded dirt.

{¶ 49} Karen took Sara for consultations at Children's Hospital. Sara participates in an ongoing program focused on nutrition, exercise, and healthy lifestyle. Under Karen's care, Sara eventually lost 70 pounds by cutting out sugary drinks. Karen also helped Sara learn about proper food portions as Sara would eat an entire bag of chips at once. Initially Sara needed an inhaler for possible asthma, but over time, as Sara began to physically move more frequently, she did not need the inhaler.

{¶ 50} Karen takes Sara to regular dentist appointments. Karen took Sara to a speech therapist to address her lisp and whistle. The lisp and whistle eventually disappeared after Sara performed the recommended speech therapy exercises.

{¶ 51} Consistent with the Agency's concern, Karen testified that when Sara moved in with her, Sara constantly flapped her hands, avoided eye contact, and engaged in "a lot of pacing." These behaviors improved while in Karen's care, though Sara still flaps her hands when she is happy.

### 6. Sara's Mental Health and Gender Identity Issues

*State's Witnesses' Perspectives*

{¶ 52} Channell testified that she treated Sara for almost two years, one to two times a week, as her therapist. Sara was diagnosed with posttraumatic stress disorder after her removal from Mother's care. At the time of the permanent custody hearing, Sara was undergoing cognitive behavior therapy (to change thinking patterns), dialectical behavioral therapy (to deal with self-harm), and sand-tray therapy (to deal with trauma). Channell noted that Sara expressed "a lot of anger" toward Mother "right now, and [had] no interest in reconciliation," and some anger towards Father.

{¶ 53} Channell also testified that Sara struggled with suicidal ideation and self-harm. But since Sara began therapy and through the date of the permanent custody hearing, Sara grew to have "less suicidal ideation and self-harm urges, doesn't flinch as much," developed "better social skills," and had an "easier time navigating" situations at school. Sara did have one recent self-harm incident (but no suicidal ideation). Channell believes Sara needs "ongoing" therapy.

{¶ 54} Channell testified that Sara has struggled with her sexuality and gender identity, and preferred "they/them" pronouns at the time of the permanent custody

hearing. But Channell referred to Sara as "she" and testified that she would feel comfortable calling Sara a "she" in front of her. Channell explained that while Sara thought she had gender dysphoria, Channell in her professional opinion denied that Sara has gender dysphoria and testified that it is not a major issue for Sara. She also testified that Sara's self-harm and suicidal ideation are motivated by past trauma, rather than gender-related issues.

{¶ 55} Channell testified that Sara "really really is excited and grateful for her placement" with Karen and talks about "how much of a support system she has right now." Channell testified that she believed that Sara was not mentally ready to be reunited with Mother or Father at the time of the permanent custody hearing because of her "extreme . . . amount of anger" and the "significant amount of stress" seeing her parents brings Sara. Channell also testified that it would "be more traumatic to force reunification at this moment" than to permanently sever her parents from her.

{¶ 56} Karen also testified about her experiences with Sara's mental health struggles. Sara has difficulty articulating if she is mad or sad, and Karen believes this is because when she lived with Mother she was "forced to always be happy" and told that she would "either be a disappointment or in trouble" if she were mad or sad. Karen testified that Sara has panic attacks.

{¶ 57} Karen took steps to address Sara's self-harming behaviors. In the summer of 2023, when Sara was struggling because of her concerns about anticipated visits with Mother, Karen obtained placement for Sara with a Child Focus therapist who visited her home a couple of times a week. Karen also worked with the Milford public schools to connect Sara with Channell. There were difficulties with locating a therapist due to Sara's Medicaid coverage, but Karen was willing to pay out-of-pocket. Karen witnessed Channell

help Sara work through her "nerves leading up to" her visits with Mother.

{¶ 58} Karen testified that Sara relapsed shortly before the permanent custody hearing and had an incident of self-harm after "400 and something days of not self-harming." Karen believed this incident was connected to past trauma.

{¶ 59} Karen also discussed Sara's struggles with gender identity and sexuality issues. Karen testified that Sara "changes her sexuality every four to five weeks" and that she lets Sara work these issues out on her own. Karen testified that Sara "came out" to her parents. Karen was present when Sara came out to Father, and Father handled the conversation "really well" and was "calm." Karen testified that Sara wanted to change her name, but not for gender-identity-related reasons; instead, Sara indicated she wanted to change her name because she associated her given name with being yelled at. Karen opined that Sara's struggles with body dysphoria are actually related to her weight, rather than gender-related issues.

*Mother's Perspective*

{¶ 60} Mother offered little testimony or insight regarding Sara's mental health. Mother denied engaging in the behaviors that other witnesses identified as exacerbating Sara's mental health struggles.

{¶ 61} Mother knew that Sara was struggling with gender identity and sexuality. She testified that when Sara initially informed her of her perceived gender identity and preferred pronouns, she was surprised and uncomfortable discussing the issue with a 13-year-old. She told Sara that she was uncomfortable and that "if she still felt this way in the future when she comes home, we would work through this." Mother later testified that Sara had since aged, and as a result Mother no longer cared what Sara wanted to be called. She also stated that Sara is her daughter and that she loves her.

## 7. Visitation

{¶ 62} As explained above, after Sara's removal, Mother and Father were permitted in-person visitation with Sara. But those in-person visits were terminated by the court in December 2023. After that, there was a period in which Father made no effort to interact with Sara, and Mother was permitted to exchange letters with Sara. The Agency ultimately did not restart in-person visits with Mother (and in fact sought an order prohibiting contact) because Sara "started having the suicidal ideations thinking that she was going to have to have visits with [Father] and . . . [Mother] again." After the termination of in-person visits, Mother never requested to reinstate or move towards in-person visits. Likewise, Sara never expressed interest in resuming visits with Mother or Father, and instead expressed strong opposition to seeing them.

### *Mother's Perspective*

{¶ 63} Mother testified that she did not know that her in-person visits with Sara were going poorly because they were "laughing, happy, [and] making jokes in the visits." She also believed the visits were going well because of a positive comment made by the CASA assigned to Sara.

{¶ 64} Mother testified that the letters she wrote to Sara during the letter-writing period were "loving." She told Sara in her letters that she was very sorry for her role in things, and noted that Sara's letters to her were "very angry."

### *Father's Perspective*

{¶ 65} Father testified that he has a good relationship with Sara and that his in-person visits with Sara went well. He testified that the visits with Sara at Karen's home stopped after he did not attend a few visits because Karen did not want Father "flitting in and out of . . . [Sara's] life." When asked at the permanent custody hearing if he wanted

to have contact with Sara, Father testified that that was "an excellent question" and stated that he would "love to have a conversation with her but . . ." and did not finish his sentence.

*State's Witnesses' Perspectives*

{¶ 66} Quallen believed that Mother's letters to Sara were not productive and that they were not helping Sara's mental health. She also testified that Sara was indifferent to Father's visits and that Karen bore the burden of trying to make their visits successful.

{¶ 67} Karen testified that Sara would be "very anxious" for two days before her in-person visits with Mother. Typically, right before each visit Sara would hope that the visits would go well, but the visits "usually [went] badly" and Sara would leave feeling "pretty down." After the visits with Mother, Sara would work through issues associated with the visit in therapy.

{¶ 68} Karen testified that Sara's in-person visits with Father were "uneventful," that Father did not know how to talk to Sara, and that there would be long silences. Karen tried to make the visits work, such as by arranging for Sara and Father to paint rocks together. At some point after Sara moved in, Father came to her house and told them that he was leaving the state for some "undetermined period of time." Karen testified that she was upset because "Sara needed an advocate." Father didn't reach out to her again until March of 2024, indicating that he wanted to visit again. Karen told him that he was not allowed to visit because he could not leave and reenter Sara's life, and that he needed to talk to the Agency to set up visits with Sara. Father did not contact the Agency about his desire to see Sara or about Karen's unilateral decision.

{¶ 69} Karen testified that when the juvenile court granted the May of 2024 cease-contact order prohibiting Father or Mother from seeing her, Sara "was a different kid" and it was like the "weight had been lifted off of her shoulders." Karen testified that Sara's

more recent self-harm incident was due to the fear of having to resume visitation with her parents, especially Mother.

{¶ 70} Channell testified that even though Sara had not seen Mother since December 2023, Sara had consistently indicated that she did not want to see Mother. Previously, when Sara was visiting her parents in person, it would take Sara a couple of days to return to normal after visits.

### 8. Religious Practice

*Mother's Perspective*

{¶ 71} Mother testified that she, Father, and Second Husband are all Messianic Jews. While she did not believe Sara was old enough to make the decision to no longer practice Messianic Judaism when Sara still lived with Mother, she did believe Sara was old enough to make this decision at the time of the permanent custody hearing.

*Father's Perspective*

{¶ 72} Father expressed his desire for Sara to continue practicing Messianic Judaism. He also expressed his strong opposition to Karen's plan to send Sara to a private Catholic high school. He characterized this plan as "unacceptable" because, in his view, Catholics practice "paganism."

*State's Witnesses' Perspectives*

{¶ 73} Channell testified that Sara previously had "a lot of anger" about religion, but she had recently had "some progress with that."

{¶ 74} Karen testified that Sara is now "staunchly anti-religious," and that Sara's religious upbringing was a very rule-based, penalty-based system. Karen has worked with Sara to help her understand why some people are religious.

### 9. Mother's Mental Health

{¶ 75} Quallen testified that Mother completed a mental health assessment and was diagnosed with borderline personality and PTSD. Mother then attended counseling on a consistent basis. However, the Agency received no updates on Mother's mental health condition after late 2024 because Mother refused to sign a new release form authorizing the Agency to receive her mental health records.

### 10. Father's Mental Health

{¶ 76} Father completed a mental health assessment and substance abuse treatment. He has continued counseling to work on his avoidance issues and takes medications. Father also sees an online doctor for Father's "healing," but this doctor is "unorthodox" and believes the vertebrae of a broken back and infertility can be healed through "the power of [the] mind."

### 11. Mother and Second Husband's Relationship

{¶ 77} At some point after Second Husband left Mother, Sara, and the stepsisters prior to their eviction from the Lebanon home, Mother and Second Husband reunited. According to Quallen, they separated "several times" during this case: on at least one occasion, Second Husband "hid[] in the woods . . . to get away from [Mother];" Father left for a period of time to go to "the drug trailer;" and Mother "left [Father] here in Wilmington" when they argued. This unstable relationship was a concern for the Agency.

### 12. Mother's Living Situation and Finances

{¶ 78} Mother and Second Husband had trouble finding a home due to their previous eviction and prior criminal convictions, but they eventually rented a home in Middletown beginning in July 2024. Mother testified that their rented home in Middletown was a four-bedroom house with 2,000 square feet.

{¶ 79} Quallen testified that the Agency was concerned about the amount of rent for Mother's new home. Their rent was $2,300 a month; Second Husband made $2,300 a month, and Mother received disability of under $1,000 a month. Mother also sold cheesecakes on the side for $75 a cake. Quallen was thus concerned that Mother's and Second Husband's joint income would allow them to pay rent, but leave little for the care of Sara (or, presumably, for other expenses).

{¶ 80} On the other hand, Mother testified she and Second Husband have enough money to pay for their new house's rent and for Sara's care. She explained that they have money left over after paying rent, and demonstrated this by saying that they recently paid the rent and still went to eat at a Mexican restaurant.

### 13. Case Plan Progress

{¶ 81} Quallen testified that the Agency took Father off the case plan in November of 2023 because of "his lack of cooperation," and that he did not express interest in getting back on the case plan since that time. Father testified that the Agency lied to him and started treating him "like a criminal," and that he for a time did not receive the case plan "materials." Without the materials for the case plan, he "didn't see the point" of working on the case plan. And when Father did receive the case plan materials, Father testified that if he could not see Sara, there was no point in working the case plan.

{¶ 82} Quallen testified that Mother did complete the Agency case plan but that making substantial progress on an Agency case plan is not the only thing the Agency considers when reunifying a child back to their parents. Quallen testified that "when a case plan is completed, there are behavioral changes that occur" and that "[t]here's responsibility that's taken that has led to [the Agency] being involved." Quallen testified that Mother took a parenting class, but she said she did not get much out of it and that

Mother did not make the changes needed to reunify.

{¶ 83} Quallen testified that the Agency changed the goal of the case plan from reunification to the agency seeking permanent custody because of "the lack of progress on the case plan, the lack of accountability, lack of complete acknowledgement of the things that [Sara] has been through, the housing issue . . . and [t]he Agency's concern with being able to maintain that housing." Quallen further testified that the Agency was concerned with Mother's lack of parenting skills, and "dismissing everything that [Sara] says she's been through."

{¶ 84} Karen believed that "it would be . . . more beneficial, for [Sara] to be adopted by [Karen]" because in the almost two years since Sara's removal from Mother's care, conditions were never appropriate for even beginning family counseling. Quallen reiterated that "[Sara] has been adamant about what she wants" and the "Agency believes she's at an age where she should get to have a say." Quallen further testified that Mother "still vehemently denies any wrongdoing or abuse or neglect of [Sara] and believed that [Sara] has false memories," and suffered no trauma at the hands of Mother, Father, or Second Husband. Quallen noted that the Agency had seen no behavioral changes or changes in attitude from either Mother or Father.

{¶ 85} Quallen further testified that the Agency believed that there was not a legally secure placement for Sara without the granting of permanent custody to the Agency and that permanent custody was in Sara's best interest.

{¶ 86} Karen testified that she wishes to adopt Sara because Sara "wants to move on with her life." Sara expressed that she wanted to be adopted by Karen.

{¶ 87} When asked what is best for Sara, Father testified that he "can't talk for her" and that it is "extremely difficult for [him] to come up with a plan" but that "before she

comes back home, she has to have something done . . ." Father testified that "[he] think[s] [he] just want[s] out of [the] situation," apparently referring to the permanent custody case. Father also testified that Sara being with Mother "would probably be the best place to put [Sara]" but stated that wherever she goes "she's going to have be fixed . . ." Again, Father's testimony was not clear, and Father expressed no clear desire to regain custody of Sara.

### 14. Juvenile Court's Permanent Custody Decision

{¶ 88} In its permanent custody decision, the juvenile court found (1) that Sara "cannot be placed with [Mother] or [Father] within a reasonable time, nor should the child be placed with either of them; (2) that Sara had been in the Agency's custody for at least 12 of the previous 22 months; and (3) that an award of permanent custody was in Sara's best interest. The court awarded permanent custody of Sara to the Agency, terminating Mother's and Father's parental rights.

{¶ 89} Mother and Father timely appealed.

### II. Legal Analysis

{¶ 90} Mother and Father each raise one assignment of error. We will address their assignments of error together, as they raise similar arguments.

### A. Weight and Sufficiency of the Evidence

{¶ 91} Mother's sole assignment of error states:

> THE TRIAL COURT'S DECISION AWARDING PERMANENT CUSTODY TO THE AGENCY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND IS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 92} Father's sole assignment of error states:

> THE TRIAL COURT ERRED WHEN IT TERMINATED [HIS] PARENTAL RIGHTS.

- 25 -

{¶ 93} Both Mother and Father make various arguments on appeal as to why the juvenile court's permanent custody findings are not supported by sufficient evidence or are otherwise against the manifest weight of the evidence. Some of these argument touch upon concepts relevant to the two prongs of R.C. 2151.414(B)(1)'s permanent custody test, and we will address their arguments within that framework where relevant below.

**1. Applicable Law and Standards of Review**

{¶ 94} "Before a natural parent's constitutionally protected liberty interest in the care and custody of [their] child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met." *In re M.G.*, 2023-Ohio-1316, ¶ 44 (12th Dist.); R.C. 2151.414(E). "Under R.C. 2151.414(B)(1), the juvenile court may terminate the parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test." *In re N.L.*, 2025-Ohio-2625, ¶ 20, (12th Dist.), citing *In re K.P.*, 2022-Ohio-1347, ¶ 17 (12th Dist.). "First, R.C. 2151.414(B)(1) provides that the juvenile court must find that the grant of permanent custody to the agency is in the 'best interests' of the child." *In re N.L.*, 2025-Ohio-2625, ¶ 20, (12th Dist.), citing *In re M.H.*, 2022-Ohio-48, ¶ 35 (12th Dist.). "Second, the juvenile court must find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) apply." *In re R.C.*, 2025-Ohio-5150, ¶ 52 (12th Dist.), citing *In re R.B.*, 2022-Ohio-1705, ¶ 31(12th Dist.). Those circumstances include, but are not limited to: (1) the child is abandoned, R.C. 2151.414(B)(1)(b); (2) the child is orphaned, R.C. 2151.414(B)(1)(c); (3) the child has been in temporary custody of one or more public children service agencies for 12 of more months of a consecutive 22-month period, R.C. 2151.414(B)(1)(d); (4) the child has been removed from the parents' custody or been adjudicated as abused, neglected, or dependent on three separate occasions,

R.C. 2151.414(B)(1)(e); and (5) the circumstances described in R.C. 2151.414(B)(1)(b), (c), (d), and (e) do not apply and the child cannot be placed with either the child's parents within a reasonable time or should not be placed with the parents, R.C. 2151.414(B)(1)(a). *In re J.B.*, 2023-Ohio-2454, ¶ 13 (12th Dist.). Only one of these circumstances need to apply to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 2020-Ohio-4414, ¶ 16 (12th Dist.).

{¶ 95} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re A.S.*, 2020-Ohio-4127, ¶ 19 (12th Dist.). However, "[e]ven if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence." *In re G.A.*, 2023-Ohio-643, ¶ 18 (12th Dist.), citing *In re F.S.*, 2021-Ohio-345, ¶ 61 (12th Dist.). In determining whether a juvenile court's judgment is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence favors the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 2021-Ohio-3074, ¶ 15 (12th Dist.). Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it the interpretation that is consistent with the verdict and judgment. *In re D.S.*, 2022-Ohio-998, ¶ 63 (12th Dist.).

## 2. First Part of Permanent Custody Test: Best Interest Analysis

{¶ 96} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, a juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . .;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in division (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 97} A juvenile court may also consider any other factors it deems relevant to the child's best interest." *In re A.J.*, 2019-Ohio-593, ¶ 24 (12th Dist.).

{¶ 98} In this case, the juvenile court evaluated each of the best interest factors outlined in R.C. 2151.414(D) and concluded that granting permanent custody of Sara to the Agency was in the child's best interest. Upon review, we agree.

{¶ 99} As to the first best-interest factor— that is, the interaction and relationship of the child with her parents, foster caregivers, and others, R.C. 2151.414(D)(1)(a)—the juvenile court found that Sara "is well-bonded with . . . [Karen], and [Karen] intends to adopt [Sara]. [Sara] remains adamantly opposed to communicating, let alone reunifying,

- 28 -

with her parents and wishes to be adopted." The weight of the evidence supports the juvenile court's finding. The record also demonstrates that Sara's relationship with Mother is quite poor. Mother's visitations and communications made Sara nervous, anxious, and angry. Throughout her case, Sara remained steadfastly insistent that she did not want to visit Mother and that her visits with Mother exposed her to emotional and verbal abuse. The record reveals that even the anticipation of Mother's visits caused Sara excessive anxiety and worsened her self-harm and suicidal ideation tendencies. This is unsurprising, given the extensive evidence of Mother's numerous parental failings and mistreatment of Sara.

{¶ 100} Notably, Mother essentially admitted the challenges that Sara's return to Mother's care would present. Specifically, she testified that Sara's allegations against her were untrue, and that it "makes me unsafe if [Sara] believes certain things happened between us that didn't, [and] I think she needs a lot of therapy before she could come back home."

{¶ 101} As to Father, the record demonstrates that Sara is indifferent to Father and their relationship. Father was voluntarily in-and-out of Sara's life; he was not a consistent support for Sara, and instead chose when he wanted to be involved. Father exhibited the same absentee attitude towards Sara's case and was eventually removed from the case plan for his lack of engagement. Father's visits with Sara were described as "uneventful" and were largely arranged or facilitated by Karen. While Father argues in his appellate brief that he and Sara would have overcome the gap between them if not for "the interference by the trial court and [Karen]," this is mere speculation that is inconsistent with other evidence in the record. That evidence paints a clear picture: Father and Sara have virtually no relationship, or, at best, a quite strained relationship.

{¶ 102} On the other hand, the record demonstrates that Sara has been in the care of her half sister, Karen, for over two years and has thrived in Karen's care. Sara has felt happy, comfortable, and safe with Karen. Karen has helped her improve numerous aspects of her life, from academics to healthier eating to addressing trauma in therapy sessions. Karen wants to adopt Sara, and Sara agrees.

{¶ 103} For these reasons, the first best-interest factor favors an award of permanent custody to the Agency.

{¶ 104} As to the second best-interest factor—the wishes of the child, R.C. 2151.414(D)(1)(b)—the juvenile court noted that Sara "has repeatedly voiced her opposition to reunification during in camera interviews as well as reiterating this stance to her therapist and caseworker." Again, the record evidence supports the juvenile court's finding. Sara adamantly wishes for Karen to adopt her, and the only way that Karen can adopt Sara is by the juvenile court granting permanent custody to the Agency. Sara is 14 years old and has the capacity to state her preference on this issue. The GAL also recommended in all three of her reports that the Agency's motion for permanent custody should be granted. And as just mentioned, Sara expressed her preference to the juvenile court judge during in camera interviews. For these reasons, the second best-interest factor favors an award of permanent custody to the Agency.

{¶ 105} As to the third best-interest factor—the custodial history of the child, R.C. 2151.414(D)(1)(c)—the juvenile court found that Sara had been in the custody of the Agency for at least 12 of the last 22 months at the time the permanent custody motion was filed. We agree. Therefore, the third best-interest factor favors an award of permanent custody to the Agency.

{¶ 106} As to the fourth best-interest factor—the child's need for a legally secure

permanent placement, R.C. 2151.414(D)(1)(d)—the juvenile court found that Sara's "need for a legally secure permanent placement cannot be achieved without a grant of permanent custody to the Agency" and that "adoption presents the best chance for [Sara] to be provided and cared for without potential dire consequences for the child's mental and physical well-being." The record evidence supports this conclusion.

{¶ 107} Father cannot provide a legally-secure permanent placement for Sara. Father has been absent for most of Sara's life and has given no credible indication that he could provide a stable home for her. Despite his decision to appeal in this case, Father even testified that he felt that Sara should be with Mother, and not with him. And when Karen asked Father why he did not allow Sara to live with him when she was homeless, Father—shockingly—stated that it was better for Sara to be homeless with Mother than to live in his home. The Agency also removed Father from the case plan due to his lack of involvement and engagement.

{¶ 108} Mother also cannot provide a legally-secure permanent placement for Sara. Mother checked the boxes of her case plan, but she has not demonstrated that she is truly ready to care for and support Sara. The Agency's concerns that Mother did not make the internal changes needed to regain custody of Sara are well-founded and supported by the record evidence. Mother obtained housing, but its stability was questionable in light of the unlikelihood that Mother and Second Husband would be able to afford Sara's care given the high rent they pay as compared to their modest incomes. Rather than take ownership for the negative impact that homelessness had on Sara, Mother downplayed the seriousness of the situation the family was in and downplayed the negative impact of homelessness on Sara. Mother also failed to take ownership of incidents of domestic violence in which she was involved. Mother's explanation of those

incidents was not credible, and she even justified slapping Second Husband.

{¶ 109} Mother did not take responsibility for Sara's educational neglect; she claimed she homeschooled Sara, but she apparently did not sufficiently supervise Sara's education as Sara was failing multiple online classes and spent school time in chat rooms. The vast improvement in Sara's educational achievement since she began living with Karen only underscores Mother's failure to provide an adequate education. Perhaps most troubling, Mother failed to take responsibility for Sara's involvement in inappropriate, sexual, and damaging online activities, even though Sara was in close proximity to Mother.

{¶ 110} Karen, on the other hand, took on the role of a responsible parent and took away Sara's online access when Sara demonstrated that she was unable to use the internet responsibly. Likewise, the significant improvement in Sara's weight and other physical and mental health conditions while under Karen's care underscores Mother's failure to support Sara in those areas. Finally, because Mother refused to provide the Agency with access to her own mental health treatment records, the concerns the Agency had about Mother's mental health remain unaddressed.

{¶ 111} Moreover, Mother cannot provide Sara a secure place to live because Sara feels anything but secure with Mother. Sara becomes overwhelmed and anxious even thinking about seeing Mother. Sara consistently represented that she did not want to see Mother. Testimony from Sara's counselor, from the Agency caseworker, and from Karen suggest that Sara's mental and behavioral progress would be diminished if she was returned to Mother's custody.

{¶ 112} Mother argues that she completed the case plan's requirements, so it was error to award permanent custody to the agency. But as we have repeatedly held, "a case

plan is simply a means to a goal and is not the goal itself." *In re N.L.*, 2025-Ohio-2625, ¶ 39 (12th Dist.), citing *In re F.S.*, 2021-Ohio-345, ¶ 68 (12th Dist.). As a result, "a parent's successful completion of the terms of a case plan is not dispositive…" *In re A.R.*, 2016-Ohio-4919, ¶ 18 (12th Dist.), citing *In re K.B.*, 2013-Ohio-858, ¶ 25 (12th Dist.). As explained above, there is plenty of evidence in the record to support the conclusion that Mother's completion of the case plan did not undermine the award of permanent custody to the Agency.

{¶ 113} Therefore, the fourth best-interest factor favors an award of permanent custody to the Agency.[7]

{¶ 114} To the extent Mother and Father's arguments invite this court to reweigh the evidence, their arguments are without merit. "[R]ather than reweighing the evidence and substituting our own best interest findings for that of the juvenile court, this court must

---

7. **{¶ a}** Though not stated explicitly, there is some suggestion in the state's brief and in the juvenile court's permanent custody decision that Mother and Father were unfit as parents because they both were initially reluctant to embrace Sara's announcement that she was transgender and/or using male pronouns. We disagree. There is no requirement in Ohio law that parents must unquestioningly accept and support their minor children's claims of transsexual identity or preferred pronouns. In fact, this issue remains hotly-contested socially, politically, and legally. As an example, the State of Ohio has banned so-called "gender-affirming care" for minors because of the inherent risk of providing such treatments to minors, whose minds are developing and may change. *See* R.C. 3129.02. That statute is currently being litigated. *See Moe v. Yost*, 2025-Ohio-914, ¶ 1 (10th Dist.). Meanwhile, the United States Supreme Court has upheld a similar ban in Tennessee. *See generally United States v. Skrmetti*, 605 U.S. 495 (2025). Quite recently, Justice Barrett, joined by Chief Justice Roberts and Justice Kavanaugh, emphasized that "the doctrine of substantive due process has long embraced a parent's right to raise her child, which includes the right to participate in significant decisions about her child's mental health." *Mirabelli v. Bonta*, 2026 U.S. LEXIS 1192, *9 (U.S.) (concurring opinion). From a best-interest analysis perspective, we see no serious concern presented by Mother's and Father's cautious reactions to Sara's disclosure of her perceived transgender status and preference for male pronouns. This lack of concern is particularly bolstered here, where both Karen and Sara's therapist testified that Sara is struggling with gender identity and sexuality, and Karen explained that Sara tended to "change[] her sexuality every four to five weeks." Children who struggle with these issues deserve sober and sensitive guidance, and Ohio law does not require parents unquestioningly to accept whatever their children say about their gender identity or sexuality at that particular moment.

**{¶ b}** There is also a possible suggestion in the state's brief and in the juvenile court's decision that Mother and Father should be faulted, in a best-interest analysis, for not unquestioningly supporting Sara's turn away from their family's Messianic Judaism. This is also not supported by Ohio law. Parents are free to assist and guide their children in the development of their religious faith. *See Suwareh v. Nwankwo*, 2018-Ohio-3737, ¶ 29 (12th Dist.), quoting *Pater v. Pater*, 63 Ohio St.3d 393, 397 (1992) ("[P]arents have a fundamental right to educate their children, including the right to communicate their moral and religious values . . . and 'direct the religious upbringing of their children.'").

instead give deference to the juvenile court's best interest findings . . ." *In re G.B.*, 2025-Ohio-5803, ¶ 41 (12th Dist.). "This is because, as it is also now well established, 'it is the juvenile court, not this court, that is in the best position to determine the credibility of the witnesses and determine the weight to be given to the evidence.'" *Id.*, quoting *In re A.V.*, 2024-Ohio-1091, ¶ 36 (12th Dist.).

{¶ 115} As a result of the foregoing, we conclude that the juvenile court did not err in finding the best interest factors weighed in favor of awarding permanent custody of the Agency. There is sufficient credible evidence to support the juvenile court's determination, and the juvenile court's determination is not against the manifest weight of the evidence.

### 3. The Second Part of the Permanent Custody Test

{¶ 116} As mentioned above, the juvenile court found that two of the circumstances under the second prong of the permanent custody test were met. Specifically, the court found that (1) Sara had been in the Agency's custody for at least 12 of the last 22 months (referencing the "12 of 22" circumstance described in R.C. 2151.414[B][1][d]), and (2) the children could not or should not be placed with either the Mother or Father in a reasonable time (referencing the "reasonable time" circumstance described in R.C. 2151.414[B][1][a]).

{¶ 117} On appeal, Mother and Father do not challenge the juvenile court's "12 of 22" finding. Because they do not challenge the "12 of 22" finding, we do not need to review that finding. *In re Z.B.*, 2024-Ohio-5387, ¶ 32 (12th Dist.). However, we note that the record unquestionably establishes that the "12 of 22" finding was met because Sara was placed in temporary custody of the Agency in May of 2023, was adjudicated dependent in May of 2023, and remained in the Agency's custody through the date the Agency filed for permanent custody in September of 2024. Because only one of the R.C.

2151.414(B)(1)(a) to (e) findings must be met to satisfy the second prong of the two-part permanent custody test, we need not review the juvenile court's "reasonable time" finding. *In re R.B.*, 2023-Ohio-3145, ¶ 51, citing *In re J.N.L.H.*, 2022-Ohio-3865, ¶ 26 (12th Dist.). As such, the state satisfied the second prong of the permanent custody test.

### III. Conclusion

{¶ 118} For these reasons, we conclude the juvenile court did not err by determining that it was in Sara's best interest to grant permanent custody to the Agency. The juvenile court's decision to grant permanent custody of Sara to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. We overrule Mother's assignment of error and Father's assignment of error.

{¶ 119} Judgment affirmed.

HENDRICKSON and PIPER, JJ., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Clinton County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Matthew R. Byrne, Presiding Judge

/s/ Robert A. Hendrickson, Judge

/s/ Robin N. Piper, Judge